## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

Edward Hugan and Damany Derek
Williams,

                Plaintiffs,

v.

City of Detroit, *et al.*,

                Defendants.

_____/

Case No. 20-10767

Judith E. Levy[1]
United States District Judge

Mag. Judge Anthony P. Patti

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT [23]

Between March and May of 2018, the Detroit Police Department ("DPD") conducted three raids on the Green House, a medical marijuana dispensary where Plaintiffs, Edward Hugan and Damany Williams, worked as security guards. During the third raid, Plaintiffs were frisked, detained, ticketed, and forced to forfeit personal property, including cash and their vehicles. They now bring constitutional claims under 42 U.S.C. § 1983 as well as claims under state law. Defendants, the City of Detroit

---

[1] This case was originally assigned to Senior U.S. District Judge Arthur J. Tarnow, who passed away on January 21, 2022. May he rest in peace.

and three of the DPD officers involved in the third raid[2]—William Morrison, Edward Wright, and Johnathon Gardner—have moved for summary judgment. (ECF No. 23.) Defendants' motion is fully briefed, (ECF Nos. 24, 27), and appropriate for determination without a hearing. *See* E.D. Mich. L.R. 7.1(f)(2).

For the reasons set forth below, Defendants' Motion is **GRANTED in part and DENIED in part**. Judgment is awarded to Defendants on Plaintiffs' federal claims; Plaintiffs' state law claims are **DISMISSED without prejudice**.

## I.    Background

The first raid of the Green House took place on March 29, 2018. (ECF No. 23-3, PageID.165.) Earlier that day, Defendant Officer Edward Wright obtained a warrant in Wayne County Circuit Court to search the property. (ECF No. 23-2, PageID.162–164.) The warrant affidavit claimed, among other things, that the Green House was operating without a proper license. (*Id.* at PageID.162–163.) The raid yielded a

---

[2] Plaintiffs initially also sued four other DPD employees involved in the third raid: Sgt. Roy Harris and Officers Ryan Paul, Henry Love, and Najah Allen. However, because Plaintiffs failed to timely serve those Defendants, they were dismissed without prejudice on November 9, 2021. (ECF No. 25.)

significant amount of marijuana and cash. (ECF No. 23-3, PageID.168–169.) Although the Green House's owner, Mike Awdish, was arrested, Plaintiff Hugan, who was also present that day, was permitted to wait outside in his car once the officers learned he was a security guard. (ECF No. 23-3, PageID.168; ECF No. 23-9, PageID.239.)

Two weeks later, on April 13th, Defendant Officer Wright began to suspect that the Green House had resumed its sales. (ECF No. 23-4, PageID.177–178.) Accordingly, the DPD raided the business a second time. (ECF No. 23-5, PageID.182–183.) Defendant Officer Wright was correct: The Green House had, in fact, reopened for business on March 30th. (ECF No. 23-9, PageID.240.) But although the DPD issued six misdemeanor citations that day, including to some Green House employees, Plaintiff Hugan was once again permitted to wait outside without penalty after making clear to officers that he was a security guard. (ECF No. 23-5, PageID.182; ECF No. 23-9, PageID.241.)

Shortly after the second raid, the Green House halted its sales and blocked off its parking lot with traffic cones. (*Id.* at PageID.226.) Nevertheless, many people continued to try to visit the establishment. (*Id.* at PageID.230.) Accordingly, even though the Green House's

salespeople had been laid off, its security guards were kept on staff to maintain the safety of the property and provide information to visitors. (*Id.* at PageID.226.) When inquirers came to the door, the security guards would urge them to vote to legalize marijuana and provide information about voter registration and medical marijuana licenses. (*Id.* at PageID.227.) These conversations would sometimes take place inside. (*Id.*) It was on May 19th, during this period of closure, that the Green House was raided a third time.

The day before the raid, Defendant Officer Wright obtained another search warrant in Wayne County Circuit Court. (ECF No. 23-6.) In his supporting affidavit, Defendant Officer Wright described the first two raids and alleged that on May 11th, he had received information from Michigan Licensing and Regulatory Affairs that the Green House was still subject to a cease-and-desist order, and that on May 10th and 17th, he had observed several people visiting the Green House for short durations. (*Id.* at PageID.190–191.)

Defendant Officer Wright executed the warrant the afternoon of May 19th alongside Defendant Officers William Morrison and Jonathan Gardner, and Officers Ryan Paul, Henry Love, and Najah Allen. (ECF

No. 23-7, PageID.194.) Supervising the raid was Sgt. Roy Harris. (*Id.*) When the officers arrived, Plaintiff Hugan was standing at the front door. (ECF No. 23-9, PageID.229.) He was first approached by Defendant Officer Morrison, who had his gun drawn, and Sgt. Harris, who recognized Plaintiff Hugan from the prior raids and ordered him to get on the ground. (*Id.*; ECF No. 20-7, PageID.199.) Because it was raining, Plaintiff Hugan did not want to get on the ground, and informed Sgt. Harris that there was nothing illegal on the premises due to the business having been shut down. (*Id.*) Undeterred, Sgt. Harris ordered Plaintiff Hugan into the building and directed another officer to place him in handcuffs. (*Id.*)

The officers entered the Green House and found Plaintiff Williams, who had stopped by to pick up his pay, seated behind the counter with Isaiah Rhone, another employee who helped manage the building. (ECF No. 23-9, PageID.226–227; ECF No. 23-10, PageID.275–276.) Defendant Officer Morrison, who still had his gun drawn, ordered Plaintiff Williams and Rhone to freeze. (ECF No. 23-7, PageID.199; ECF No. 23-10, PageID.275.) The two men were handcuffed and ordered to the ground by Officer Allen. (ECF No. 23-7, PageID.201; ECF No. 23-10, PageID.277.)

5

Plaintiff Hugan was eventually ordered to the floor as well. (ECF No. 23-9, PageID.233.) Plaintiffs remained inside on the ground throughout the search. (ECF No. 23-10, PageID.281.)

After attempting to disable the Green House's security cameras, the officers spent several hours conducting a thorough, yet destructive, search of the building. (ECF No. 23-9, PageID.232; ECF No. 23-10, PageID.275.) The officers repeatedly demanded that Plaintiffs tell them where the drugs were hidden. (ECF No. 23-9, PageID.233; ECF No. 23-10, PageID.275.) Plaintiffs responded that they were aware of no hidden drugs. (*Id.*)

At one point, Officer Paul began questioning Plaintiffs about two vehicles parked in the lot outside: a 2008 Ford Edge, which belonged to Plaintiff Williams, and a 2001 Chevy Tahoe, which belonged to Plaintiff Hugan. (ECF No. 23-7, PageID.200; ECF No. 23-9, PageID.233–234; ECF No. 23-10, PageID.277.) Officer Paul claimed he had intelligence suggesting that marijuana was hidden inside one of the vehicles. (ECF No. 23-9, PageID.234.) According to Plaintiff Williams, Officer Paul said that he would take a bat and begin breaking the windows of the Ford if they did not disclose which of them was the owner. (ECF No. 23-10,

PageID.277.) Plaintiff Hugan was threatened as well. (ECF No. 23-9, PageID.229.) Faced with these threats, Plaintiffs provided Officer Paul the means to access and search their vehicles. (*Id.*; ECF No. 23-10, PageID.277.) Inside Plaintiff Williams' Ford was a backpack with $315 in cash and a properly licensed handgun. (ECF No. 23-7, PageID.200; ECF No. 23-10, PageID.280.) Inside Plaintiff Hugan's Chevy was a backpack with a disputed amount of cash.[3] (ECF No. 23-7, PageID.200; ECF No. 23-8, PageID.206; ECF No. 23-9, PageID.235.)

In addition to searching Plaintiffs' vehicles in the parking lot, the officers pulled apart the Green House's ceiling panels, tore through its walls, emptied food onto its floor, and even destroyed its ATM machine. (ECF No. 23-9, PageID.233; ECF No. 23-10, PageID.281.) Despite these efforts, however, the only marijuana the officers seized was loose "shake" (*i.e.* residue) and edibles that had been ignored during the prior raids.[4]

---

[3] According to Plaintiff Hugan, there was $400.00 in the backpack; according to Sgt. Harris, there was only $220.00. (ECF No. 23-8, PageID.206; ECF No. 23-9, PageID.235.)

[4] It is Plaintiff Hugan's opinion that the officers were only there for money. (ECF No. 23-9, PageID.233.) Plaintiff Hugan points out, for example, that the officers seized $2,606.00 from the cash register and $15,540.00 from the ATM machine but neglected to take a number of marijuana vape pen cartridges. (ECF No. 23-7,

(ECF No. 23-7, PageID.195, 201; ECF No. 23-9, PageID.233; ECF No. 23-10, PageID.279.) The officers nevertheless elected to seize Plaintiffs' vehicles and other property and cite them for Loitering in a Place of Illegal Occupation. (ECF No. 23-7, PageID.195, 198, 200; ECF No. 24-2, PageID.330.)

## II.   Legal Standard

Summary judgment is appropriate where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). "A 'material' fact is one that 'might affect the outcome of the suit under the governing law.' And a genuine dispute of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the [nonmoving] party.'" *Abu-Joudeh v. Schneider*, 954 F.3d 842, 849 (6th Cir. 2020) (citations omitted) (first quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); then

---

PageID.195, 198; ECF No. 23-9, PageID.233.) *See generally How Marijuana Is Consumed*, DRUG POL'Y ALL., https://drugpolicy.org/drug-facts/10-facts-about-marijuana/how-marijuana-consumed, [https://perma.cc/777J-Z3BQ] (last visited Mar. 9, 2022). Such a thing would not be unheard of. *See, e.g.*, MICHELLE ALEXANDER, THE NEW JIM CROW: MASS INCARCERATION IN THE AGE OF COLORBLINDNESS 101-06 (10th anniversary ed. 2020) (describing "drug busts motivated by the desire to seize cash, cars, homes, and other property" and explaining how asset forfeiture laws have created perverse incentives within law enforcement agencies).

quoting *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 775 (6th Cir. 2016)).

The moving party bears the burden of demonstrating an absence of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

> If the moving party meets this burden, the burden then shifts to the nonmoving party to establish a "genuine issue" for trial via "specific facts." Additionally, the moving party is entitled to summary judgment when the nonmoving party "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."

*Abu-Joudeh*, 954 F.3d at 840 (citations omitted) (quoting *Celotex Corp.*, 477 U.S. at 322, 324).

The Court views all of the facts in the light most favorable to the nonmoving party and draws "all justifiable inferences" in the nonmoving party's favor. *Anderson*, 477 U.S. at 255; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). "In other words, 'at the summary judgment stage[,] the judge's function is not . . . to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'" *Jackson*, 814 F.3d at 775 (alteration in original) (quoting *Anderson*, 477 U.S. at 249).

## III.  Analysis

Plaintiffs concede to dismissal of Count II, their municipal liability claim against the City of Detroit, as well as the portion of Count I that involves the Michigan Constitution. (ECF No. 24, PageID.310, 314.) Additionally, although Plaintiffs' Complaint initially alleged violations of the First, Fourth, Eighth, and Fourteenth Amendments (*see* ECF No. 1), Plaintiffs' Response (ECF No. 24) abandoned all but their Fourth Amendment theory. *See Brown v. VHS of Mich.*, Inc., 545 F. App'x 368, 372 (6th Cir. 2013). Accordingly, the issues presently before the Court are Plaintiffs' 42 U.S.C § 1983 claim for Fourth Amendment violations and Plaintiffs' state law claims for battery, intentional inflection of emotional distress, false imprisonment, and gross negligence against Defendant DPD Officers Morrison, Wright, and Gardner.

### a. 42 U.S.C. § 1983 Claim

Defendants contend that they are entitled to qualified immunity on Plaintiffs' 42 U.S.C. § 1983 claim. (ECF No. 23, PageID.144.) Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S.

10

800, 818 (1982). Plaintiffs bear the burden of proving that Defendants are not entitled to qualified immunity. *Gardenhire v. Schubert*, 205 F.3d 303, 311 (6th Cir. 2000).

"In evaluating the merits of a qualified immunity defense, [courts typically] . . . engage in a two-step analysis: (1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and if so, (2) whether that right was clearly established." *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Myers v. Potter*, 422 F.3d 347, 352 (6th Cir. 2005)); *see also Pearson v. Callahan*, 555 U.S. 223, 236 (2009) (permitting judges "to exercise . . . discretion in deciding which of the two prongs . . . should be addressed first").

Plaintiffs' primary argument is that Defendants lacked probable cause for the third raid because Defendant Officer Wright's warrant affidavit did not "in, and of itself, show[] evidence of any criminal activity." (ECF No. 24, PageID.306.) Plaintiffs are incorrect. "Probable cause exists 'when there is a "fair probability" . . . that contraband or evidence of a crime will be found in a particular place.'" *United States v. Thomas*, 605 F.3d 300, 307 (6th Cir. 2010) (quoting *United States v.*

*Helton*, 314 F.3d 812, 820 (6th Cir. 2003)). Here, as Plaintiffs acknowledge, Defendant Officer Wright's affidavit included "a determination that the premises did not have a proper license to act as a marijuana dispensary" as well as his observation of "a number of unknown individuals, on two separate days, entering the premises and purportedly leaving after a short period of time." (ECF No. 24, PageID.307.) Taken together, these observations created a "fair probability" that evidence of further marijuana sales would be found inside the Green House. *Thomas*, 605 F.3d at 307. It was the most obvious and reasonable conclusion based on the information presented, and there is no evidence, let alone a "substantial preliminary showing," that Defendant Officer Wright lied or recklessly disregarded the truth. *See Franks v. Delaware*, 438 U.S. 154, 155–56 (1978). Accordingly, Plaintiffs' challenge to probable cause is without merit.

Plaintiffs next argue that the officers violated their Fourth Amendment rights by seizing their property and issuing citations to them. (ECF No. 24, PageID.308.) Although here Plaintiffs may be at least

partially correct,[5] their § 1983 claim ultimately fails because there is no evidence that the three remaining Defendants—Officers Morrison, Wright, and Gardner—played any part in those actions. (ECF No. 23-7, PageID.199, 202–203.) It was Officer Paul who seized Plaintiffs' vehicles and Plaintiff Williams' handgun, and Sgt. Harris who seized Plaintiffs' cash and cited them for loitering. (*Id.* at PageID.195, 198, 200; ECF No. 23-9, PageID.237; ECF No. 23-10, PageID.277.) Defendant Officers Morrison, Wright, and Gardner may have been complicit in questionable conduct, such as attempting to disconnect the Green House's security cameras, but they did not violate Plaintiffs' clearly established constitutional rights. *See Haywood v. Hough*, 811 F. App'x 952, 960 (6th Cir. 2020) (explaining that "direct responsibility," rather than "mere presence," is required to subject an officer to liability under § 1983); *Binay v. Bettendorf*, 601 F.3d 640, 650 (6th Cir. 2010). Defendants are thus entitled to summary judgment on Plaintiffs' § 1983 claim.

---

[5] For example, because Defendants had discovered no evidence of illegal activity in Plaintiff Hugan's vehicle and knew from prior visits that he was merely a security guard, their subsequent seizure of that vehicle was likely unconstitutional. *See Mobley v. City of Detroit*, 938 F. Supp. 2d 669, 683 (E.D. Mich. 2012) (seizure of vehicle pursuant to nuisance abatement is unlawful where vehicle is merely used to drive to site of nuisance and there is no evidence that vehicle was otherwise involved in criminal activity).

**b. State Tort Claims**

Because Defendants are entitled to summary judgment on Plaintiff's federal claims, the Court declines to assert supplemental jurisdiction over Plaintiffs' remaining state law claims. *See* 28 U.S.C. § 1367(c)(3); *Musson Theatrical v. Fed. Exp. Corp.*, 89 F.3d 1244, 1255 (6th Cir. 1996).

## CONCLUSION

IT IS ORDERED that Defendants' Motion for Summary Judgment (ECF No. 23) is GRANTED in part and DENIED in part. Judgment is awarded to Defendants on Plaintiffs' federal claims. Plaintiffs' state law claims are dismissed without prejudice.

IT IS SO ORDERED.

Date: March 11, 2022           s/Judith E. Levy
    Ann Arbor, Michigan       JUDITH E. LEVY
                                  United States District Judge

## CERTIFICATE OF SERVICE

The undersigned certifies that the foregoing document was served upon counsel of record and any unrepresented parties via the Court's ECF System to their respective email or first-class U.S. mail addresses disclosed on the Notice of Electronic Filing on March 11, 2022.

s/William Barkholz
WILLIAM BARKHOLZ
Case Manager